AMOUNT _____
SUMMONS ISSUED YES
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _Kim Abell_
_____ 1-12-04

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES J. NIZZO and VIRGINIA C. NIZZO, As Joint Tenants, and CARLO CILIBERTI, On Behalf of Themselves And All Others Similarly Situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| BIOPURE CORPORATION, THOMAS A. MOORE, CARL W. RAUSCH, and RONALD F. RICHARDS, | ) ) ) ) ) |
| Defendants. | ) ) |

CIVIL ACTION No.

# 04-10065NG

MAGISTRATE JUDGE _Dein_

## CLASS ACTION COMPLAINT
### FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
### and
### DEMAND FOR JURY TRIAL

Plaintiffs have alleged the following based upon the investigation of plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Biopure Corporation ("Biopure" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein

SCANNED
DATE: 1-12-04
BY: Kim

after a reasonable opportunity for discovery.

## Nature of the Action

1.    This is a federal class action on behalf of
purchasers of the securities of Biopure between March 17,
2003, and December 24, 2003, inclusive (the "Class
Period"), seeking to pursue remedies under the Securities
Exchange Act of 1934 (the "Exchange Act").

## Jurisdiction and Venue

2.    The claims asserted herein arise under and
pursuant to Sections 10(b) and 20(a) of the Exchange Act
[15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated
thereunder by the Securities and Exchange Commission
("SEC") [17 C.F.R. § 240.10b-5].

3.    This Court has jurisdiction over the subject
matter of this action pursuant to 28 U.S.C. § 1331 and
Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.    Venue is proper in this District pursuant to
Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).
Biopure maintains its principal place of business in this
District and many of the acts and practices complained of
herein occurred in substantial part in this District.

5.    In connection with the acts alleged in this
complaint, defendants, directly or indirectly, used the

means and instrumentalities of interstate commerce,
including, but not limited to, mails, interstate telephone
communications and the facilities of the national
securities markets.

<u>Parties</u>

6.    Plaintiffs James J. Nizzo and Virginia C.
Nizzo,  Joint Tenants, as set forth in the accompanying
certification, incorporated by reference herein, purchased
the securities of Biopure during the Class Period and have
been damaged thereby.

7.    Plaintiff Carlo Ciliberti, as set forth in
the accompanying certification, incorporated by reference
herein, purchased the securities of Biopure during the
Class Period and has been damaged thereby.

8.    Defendant Biopure develops, manufactures and
markets oxygen therapeutics, for both humans and veterinary
use, designed to serve as an alternative to red blood cell
transfusions and for use in the treatment of other critical
care conditions. The Company's principal executive offices
are located at 11 Hurley Street, Cambridge, Massachusetts.

9.    Defendant Thomas A. Moore ("Moore"), at all
times relevant to this action, served as the Company's
President and Chief Executive Officer.

- 3 -

10. Defendant Carl W. Rausch ("Rausch"), at all times relevant to this action, served as the Company's Vice Chairman and Chief Technology Officer.

11. Defendant Ronald F. Richards ("Richards") at all times relevant to this action, served as the Company's Chief Financial Officer.

12. The defendants referenced above in ¶¶ 9-11 are referred to herein as the "Individual Defendants."

13. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

14. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information

conveyed in the Company's public filings, press releases
and other publications as alleged herein are the collective
actions of the narrowly defined group of defendants
identified above. Each of the above officers of Biopure, by
virtue of their high-level positions with the Company,
directly participated in the management of the Company, was
directly involved in the day-to-day operations of the
Company at the highest levels and was privy to confidential
proprietary information concerning the Company and its
business, operations, products, growth, financial
statements, and financial condition, as alleged herein.
Said defendants were involved in drafting, producing,
reviewing and/or disseminating the false and misleading
statements and information alleged herein, were aware, or
recklessly disregarded, that the false and misleading
statements were being issued regarding the Company, and
approved or ratified these statements, in violation of
federal securities laws.

    15.  As officers and controlling persons of a
publicly-held company whose common stock was, and is,
registered with the SEC pursuant to the Exchange Act, and
was traded on the NASDAQ National Market (the "NASDAQ"),
and governed by the provisions of the federal securities

laws, the Individual Defendants each had a duty to
disseminate promptly, accurate and truthful information
with respect to the Company's financial condition and
performance, growth, operations, financial statements,
business, products, markets, management, earnings and
present and future business prospects, and to correct any
previously-issued statements that had become materially
misleading or untrue, so that the market price of the
Company's publicly-traded securities would be based upon
truthful and accurate information. The Individual
Defendants' misrepresentations and omissions during the
Class Period violated these specific requirements and
obligations.

        16.    The Individual Defendants participated in
the drafting, preparation, and/or approval of the various
public and shareholder and investor reports and other
communications complained of herein and were aware of, or
recklessly disregarded, the misstatements contained therein
and omissions therefrom, and were aware of their materially
false and misleading nature.  Because of their Board
membership and/or executive and managerial positions with
Biopure, each of the Individual Defendants had access to
the adverse undisclosed information about Biopure's

- 6 -

business prospects and financial condition and performance
as particularized herein and knew (or recklessly
disregarded) that these adverse facts rendered the positive
representations made by or about Biopure and its business
issued or adopted by the Company materially false and
misleading.

17.    The Individual Defendants, because of their
positions of control and authority as officers and/or
directors of the Company, were able to and did control the
content of the various SEC filings, press releases and
other public statements pertaining to the Company during
the Class Period. Each Individual Defendant was provided
with copies of the documents alleged herein to be
misleading prior to or shortly after their issuance and/or
had the ability and/or opportunity to prevent their
issuance or cause them to be corrected. Accordingly, each
Individual Defendant is responsible for the accuracy of the
public reports and releases detailed herein and is
therefore primarily liable for the representations
contained therein.

18.    Each defendant is liable as a participant in
a fraudulent scheme and course of business that operated as
a fraud or deceit on purchasers of Biopure common stock by

- 7 -

disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Biopure's business, operations, management and the intrinsic value of Biopure common stock; (b) allowed the Company to sell its common shares generating more than $36 million in proceeds (c) enabled the Individual Defendants and other insiders to sell more than $1.6 million worth of their personally-held shares of Biopure common stock at artificially inflated prices; and (d) caused plaintiffs and other members of the Class to purchase Biopure securities at artificially inflated prices.

## Plaintiffs' Class Action Allegations

19.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. Pro. 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Biopure between March 17, 2003 and December 26, 2003, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a

controlling interest.

20.   The members of the Class are so numerous
that joinder of all members is impracticable. Throughout
the Class Period, Biopure common shares were actively
traded on the NASDAQ. While the exact number of Class
members is unknown to plaintiffs at this time and can only
be ascertained through appropriate discovery, plaintiffs
believe that there are hundreds or thousands of members in
the proposed Class. Record owners and other members of the
Class may be identified from records maintained by Biopure
or its transfer agent and maybe notified of the pendency of
this action by mail, using the form of notice similar to
that customarily used in securities class actions.

21.   Plaintiffs claims are typical of the claims
of the members of the Class as all members of the Class are
similarly affected by defendants' wrongful conduct in
violation of federal law that is complained of herein.

22.   Plaintiffs will fairly and adequately
protect the interests of the Class members and has retained
counsel competent and experienced in class and securities
litigation.

23.   Common questions of law and fact exist as to
all members of the Class and predominate over any questions

solely affecting individual members of the Class. Among the
questions of law and fact common to the Class are:

(a)   whether the federal securities laws
were violated by defendants' acts as alleged herein;

(b)   whether statements made by defendants
to the investing public during the Class Period
misrepresented material facts about the business,
operations and management of Biopure; and

(c)   to what extent the members of the Class
have sustained damages and the proper measure of damages.

24.   A class action is superior to all other
available methods for the fair and efficient adjudication
of this controversy since joinder of all members is
impracticable. Furthermore, as the damages suffered by
individual Class members may be relatively small, the
expense and burden of individual litigation make it
impossible for members of the Class to individually redress
the wrongs done to them. There will be no difficulty in the
management of this action as a class action.

## Substantive Allegations
### Background Facts

25.   Biopure purportedly develops, manufactures
and markets oxygen therapeutics, for both humans and

veterinary use, designed to serve as an alternative to red
blood cell transfusions and for use in the treatment of
other critical care conditions. The Company has developed
and manufactures two products: Hemopure - hemoglobin
glutamer — 250 (bovine), or HBOC-201-for human use, and
Oxyglobin - hemoglobin glutamer — 200 (bovine), or HBOC-
301- for veterinary use. On July 31, 2002, Biopure
submitted a biologic license application ("BLA") to the
U.S. Food and Drug Administration ("FDA") seeking
regulatory approval to market Hemopure in the United States
for patients undergoing orthopedic surgery. Previously the
Company had obtained approval in South Africa to market
Hemopure for the treatment of adult surgical patients who
are acutely anemic. In September 2002, the Company received
a grant from the U.S. Department of the Army for the
purpose of conducting clinical trials of Hemopure for the
treatment of certain trauma patients. According to the
Company's fiscal 2002 10-K, "[t]he Company has identified
trauma as its next clinical development priority and is
working with a committee of independent civilian and
military trauma experts to broaden its trauma program."

      26.   Unknown to shareholders, in March 2003, the
Company submitted a "trauma study protocol" to the FDA, in

connection with the Company's plans to conduct a "[p]hase
II clinical trial" of Hemopure for the treatment of trauma
patients. Immediately thereafter, the FDA informed
defendants that the proposed clinical trials could not go
forward, citing "safety concerns" arising from adverse
clinical data submitted as part of the Company's July 2002
BLA seeking FDA approval to market Hemopure to orthopedic
surgery patients. Importantly, this also put defendants on
notice that FDA approval of the BLA, which would allow the
first commercial distribution of Hemopure in the United
States, was in serious doubt and most certainly would be
delayed beyond the time frames previously communicated by
defendants to the investing public.  Over the next nine
months, despite numerous opportunities in press releases,
analyst conference calls and SEC filings, defendants failed
to disclose any of these adverse facts to the investing
public. Indeed, the Company's periodic comments regarding
Hemopure during the Class Period, materially misled
investors concerning the commercial viability of Hemopure
and the expected commencement of marketing the product in
the U.S.  Prior to the disclosure of these adverse facts,
defendants conducted at least two offerings of Biopure
common stock generating millions of dollars in proceeds and

- 12 -

certain high-level Biopure insiders, including defendants
Moore and Rausch, sold hundreds of thousands of Biopure
common shares to the unsuspecting investing public at
artificially inflated prices.

27.   Then, on December 24,2003, under the threat
of civil litigation by the SEC, defendants stunned the
market by announcing that, in fact, the FDA had halted
further clinical trials of Hemopure due to safety concerns.
Defendants also disclosed that the commercial release of
Hemopure in the United States would be delayed beyond mid-
2004.

28.   Market reaction to defendants belated
disclosures was swift and severe. On December 26, 2003,
Biopure common shares lost over 16% of their value to close
at $2.43 per share, representing a decline of more than
239% from a Class Period high of $8.25 per share, reached
on or about August 21,2003.

### Materially False and Misleading Statements
### Issued During The Class Period

29.   The Class Period begins on March 17, 2003.
On that date, Biopure filed its quarterly report on Form
10-Q for the period ending January 31,2003. The Form 10-Q,
signed by defendant Richards reported that the Company had

a net loss of $0.36 per share during the first quarter

fiscal 2003 compared to a net loss of $0.38 for the same

period last year. In addition the Form 10-Q included the

following representations concerning the Company's Hemopure

research and development efforts, stating in pertinent part

as follows:

> Research and development expenses continue
> to include amounts for support of the BLA
> review process including responding to FDA
> inquiries, preparing for and participating
> in FDA inspections of facilities and
> documentation and preparing for a possible
> FDA Advisory Panel presentation. These BLA
> support costs were $2,232,000 for the first
> fiscal quarter of 2003 and are expected to
> continue at approximately the same level
> **until the middle of this calendar year, when
> the Company is hopeful that it will receive
> action by the FDA on the BLA.**
>
> * * *
>
> **If the FDA were to grant marketing approval
> for Hemopure this calendar year, we
> anticipate that we would have material
> revenues from this project in fiscal 2004.**
> We do not anticipate that we will attain
> profitability, however, until we are able to
> increase our manufacturing capacity. There
> are substantial risks and uncertainties
> relating to whether and when we will obtain
> FDA approval for Hemopure, the timing of the
> construction of additional capacity and
> other factors that may affect our ability to
> generate a profit from our research and
> development of Hemopure. [Emphasis added.]

30.    On or about March 25, 2003, Biopure issued a

press release announcing that it has raised $13.4 million

in gross proceeds through the sale of 5,548,480 shares of

its common stock at $2.42 per share. The press release

stated in pertinent part as follows:

> Hemopure® [hemoglobin glutamer - 250
> (bovine)] is approved in South Africa for
> the treatment of adult surgical patients who
> are acutely anemic and for the purpose of
> eliminating or reducing the need for
> allogenic red blood cell transfusion in
> these patients. Biopure's application to
> market Hemopure in the United States for a
> similar indication in adult patients
> undergoing elective orthopedic surgery is
> currently being reviewed by the U.S. Food
> and Drug Administration[.. .]
>
> * * *
>
> The previously announced $4.9 million in
> FY02/03 Congressional appropriations
> administered through the U.S. Army and
> anticipated $4 million in U.S. Navy funding
> from a Cooperative Research and Development
> Agreement (CRADA) **for clinical trials of
> Hemopure in trauma** are project-specific
> funds independent from Biopure's reported
> cash on hand. Completion of the pivotal
> RESUS clinical trial of Hemopure in trauma
> is contingent upon further funding. $908,900
> of the Army funding is from Grant DAMD17-02-
> 1-0697, for which the U.S. Army Medical
> Research Acquisition Activity, 820 Chandler
> Street, Fort Detrick MD 21702-5014 is the
> awarding and administering acquisition
> office. [Emphasis added.]

31.   On or about May 22,2003, Biopure issued a

press release announcing its financial results for the

second fiscal quarter ended April 30,2003. For the quarter,

the company reported a net loss of $0.35 per common share,

compared with a net loss of $0.49 per common share for the

corresponding period in 2002. Regarding the FDA's pending

approval of Bipoure's Hemopure BLA, the press release

stated in pertinent part:

> Biopure is hopeful that in mid 2003 the FDA
> will complete its review and act on
> Biopure's biologic license application (BLA)
> to market Hemopure in the United States for
> the treatment of acutely anemic adult
> patients undergoing orthopedic surgery. As
> part of this review, the agency has
> inspected the company's manufacturing and
> data-handling facilities and has audited its
> contract research partners and several
> clinical sites in the United States and
> South Africa. Biopure has responded to all
> questions raised by the FDA to date.

32.   On or about May 30, 2003, the Company issued

a press release announcing that the FDA had notified

Biopure that it will complete its review and act on the

Company's BLA for Hemopure by August 29, 2003. Defendant

Moore commented on the FDA's review process:

> We're very pleased with the FDA's progress
> in reviewing our application[.] We continue
> to work closely with the agency toward a
> final decision that will allow us to make
> Hemopure available as an alternative to red
> blood cell transfusion. We're also
> continuing our preparations to roll out the
> product to leading orthopedic surgery
> centers following approval.

33.   On or about July 23, 2003, Biopure issued a

press release announcing that it has raised $17.2 million

in gross proceeds through the sale of 3,083,000 shares of
its common stock at $5.58 per share.

34.   On or about August 21, 2003, Biopure issued
a press release announcing its financial results for the
third fiscal quarter ended July 31, 2003. For the quarter,
the Company reported a net loss of $0.28 per common share,
compared with a net loss of $0.43 per common share, for the
corresponding period in 2002. The press release included
the following representations concerning the FDA's review
of the Company's Hemopure BLA, stating in pertinent part as
follows:

> On July 30th, the FDA sent Biopure a letter
> stating that the agency has completed its
> review of the company s BLA to market
> Hemopure in the United States for the
> treatment of acutely anemic adult patients
> undergoing orthopedic surgery and for the
> elimination or reduction of red blood cell
> transfusions in these patients. The letter
> requests additional information and suspends
> the BLA review clock with 30 days remaining
> in the original review cycle. It does not
> request additional clinical trials.

35.   On or about October 30, 2003, Biopure
announced its plan to respond by June 30, 2004, to the
FDA's questions regarding its BLA for Hemopure. The press
release stated that the Company had adjusted its operating
plan to reduce expenses and conserve cash while it
completed its written response to the FDA. The press

release stated in pertinent part as follows:

> During the past two months the company has
> had several substantive interactions with
> the FDA to clarify the Agency's questions.
> Many of Biopure's responses have been
> completed. However, some require the
> retrieval of source medical documents and/or
> historical blood transfusion data from
> clinical trial sites in various countries,
> which will take several months to complete.

Defendant Moore commented, in pertinent part, as follows:

> In the best interests of our shareholders,
> today we've taken the steps necessary to
> more efficiently run our business while we
> complete our comprehensive response to all
> of the FDA's questions[.]  We view the
> Agency's questions as a "roadmap" to
> approval and have set a conservative,
> achievable target date for our response.  We
> remain enthusiastically committed to
> commercializing Hemopure in the United
> States as expeditiously as possible.

36.    The statements referenced above in ¶¶ 29-32
and 34-35 were each materially false and misleading when
made because they failed to disclose certain existing
material facts, including, inter alia:

(a)    that Biopure had been notified by the
FDA, as early as March/April 2003 that the Company's
clinical trials of Hemopure for trauma applications had
been put on hold due to "safety concerns" arising from
adverse clinical data reviewed by the FDA in connection
with the Company's BLA for Hemopure orthopedic

applications;

(b) that FDA approval of Biopure's BLA for commercial marketing of Hemopure in the United States was in serious doubt, and in any event could not have occurred sooner than late 2004; and

(c) based on the foregoing, defendants' opinions, projections and forecasts concerning the Company and its operations were lacking in a reasonable basis at all times.

### The Truth Is Revealed

37. On December 24, 2003, after the close of the market, Biopure issued a press release announcing that on December 22, 2003, it received a "Wells Notice" from the staff of the (SEC) indicating the staff's preliminary decision to recommend that the SEC bring a civil injunctive proceeding against the Company relating to defendant's disclosures concerning its communications with the FDA about a trauma study protocol the company submitted to the Agency in March 2003 and about the Company's BLA for Hemopure. The press release stated in pertinent part as follows:

> Biopure submitted the trauma protocol for a Phase H clinical trial of Hemopure for the treatment of hemorrhagic shock casualties in

the hospital setting, where red blood cell
transfusions are available. The FDA placed
this trauma protocol under a new IND that is
separate from the company's previous IND and
its BLA to market Hemopure for the treatment
of acutely anemic adult patients undergoing
orthopedic surgery and for the elimination
or reduction of red blood cell transfusions
in these patients. The protocol sought to
administer up to 15 units of Hemopure, a
proposed dosage that was 50 percent higher
than administered in previous clinical
trials.

After the in-hospital trauma protocol was
submitted to the FDA and the new IND was
assigned, the Agency placed a clinical hold
on the proposed trauma trial due to safety
concerns. The FDA referred to a review of
adverse event data from the company's Phase
in orthopedic surgery trial, which was
submitted in the BLA. The data from that
Phase HI trial has been previously presented
at medical meetings.

In May 2003, Biopure responded to the FDA's
clinical hold and also filed the response as
a BLA amendment because it discussed data
previously submitted with the BLA. That
amendment resulted in the FDA extending its
BLA review period up to 90 days, as
previously announced on May 30, 2003. The
Agency also requested three additional pre-
clinical animal studies of Hemopure in
conscious swine to address its concerns
regarding high-volume administration. After
the company's responses, the FDA has twice
declined to lift the clinical hold, most
recently in a letter dated July 30,2003.

The press release also indicated that regulatory approval

of the Hemopure BLA would be postponed at least until the

second-half of calendar 2004: